Filed 3/25/16  P. v. Ortiz CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EVIN ADONIS ORTIZ et al.,<br><br>Defendants and Appellants. | B257413<br><br>(Los Angeles County<br>Super. Ct. No. LA069901) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Greg Dohi, Judge. Affirmed as modified.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Rene Ubaldo Ramirez.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Evin Adonis Ortiz.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Bonilla.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Three men robbed Manuel Flores as he walked from the driveway to the front door of his North Hollywood home. As the robbers were fleeing, one shot at Flores, but missed. Flores's grandson, Danilo Morales, chased the robbers to their getaway car, a white Mitsubishi Montero SUV. As the Montero was driving away, one of the robbers shot at Morales through the back window, fatally wounding Morales. Witnesses, including victim Flores, were only able to describe the three perpetrators by their nationality (Hispanic), relative heights and some clothing. Soon after releasing photos of the getaway car to the media, the police received information connecting defendant Evin Ortiz to a white 1996 Mitsubishi Montero SUV, the broken back window of which had been replaced the day after the shooting. Police investigation of Ortiz led to codefendants Edwin Bonilla and Rene Ramirez. The fingerprints of all three men were found on the Montero. None of the witnesses could positively identify Bonilla, Ortiz or Ramirez from photographic or live lineups or in court, but one witness identified the clothing Ramirez was wearing in his booking photograph as the clothing worn by the man who killed Morales. All three defendants were charged with the murder of Morales committed during the course of a robbery, as well as the robbery, assault with a firearm and attempted premeditated murder of Flores. Following a joint jury trial, defendants were found not guilty of assault with a firearm, but guilty of the other charged crimes; the jury found true the felony-murder special circumstance as to all three defendants.

## PROCEDURAL HISTORY

Bonilla, Ortiz and Ramirez were jointly charged by amended information with the murder of Danilo Morales during the commission of a robbery (count 1), the attempted premeditated murder of Manuel Flores (count 2); assault with a firearm on Flores (count 3) and second degree robbery of Flores (count 4). As to count 4 (Flores robbery), the information alleged defendants knew or should have known Flores was more than 65 years old (Pen. Code, § 667.9, subd. (a)); as to counts 1, 2 and 4, it was further alleged

2

that Ramirez personally and intentionally discharged a firearm which caused great bodily injury to Morales; and that Ramirez had served a prior prison term.[1]

A jury found defendants not guilty on count 3 (assault with a firearm), but guilty on counts 1, 2 and 4. The jury found true the felony-murder special circumstance and the enhancements related to the other counts. Motions for new trial were denied.

On June 23, 2014, each defendant was sentenced to life in prison without possibility of parole for the Morales murder (count 1). Including enhancements, Ramirez was additionally sentenced to a consecutive 25 years to life for the Flores attempted murder (count 2), and 15 years for the Flores robbery (count 4). Also including enhancements, Ortiz and Bonilla were each additionally sentenced to a consecutive 7 years to life in prison for the Flores attempted murder (count 2) and a consecutive 5 years for the Flores robbery (count 4). Each defendant timely appealed.

### CONTENTIONS ON APPEAL

A. *Bonilla*

1. Insufficient evidence supports the murder conviction;
2. It was error to allow an expert witness to rely on out-of-court statements by a third party;
3. It was error to deny his request for instructions on (a) second degree murder and (b) accessory;
4. It was error to deny motions for mistrial, disclosure of juror information and new trial, which were all based on juror misconduct; and
5. Even if individually harmless, the errors were cumulatively prejudicial.

B. *Ortiz*

1. Insufficient evidence supported the special circumstance finding;
2. It was error to not instruct on second degree murder;

---

[1] All further undesignated section references are to the Penal Code.

3

3. The trial court committed sentencing errors.

C. *Ramirez*

1. It was error to deny Ramirez's request for an alibi instruction;
2. It was error to identify Ramirez as the perpetrator and shooter in instructions;
3. It was error to deny the motions for mistrial, disclosure of juror information and new trial based on juror misconduct; and
4. It was error to allow the People to file a Penal Code section 1203.01 "Statement of View."

In addition, to their individual contentions, each defendant purports to join in the contentions of his codefendants. Although a party may join the contentions of another party (Cal. Rules of Court, rule 8.200(a)(5)), cursory joinder is not enough. The joining party still has the burden of demonstrating error and prejudice as to him. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

**FACTS**

A. *People's Case*

Viewed in accordance with the usual rules of appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357), the evidence established that in January 2012, attempted murder and robbery victim Manual Flores was 68 years old, diabetic and had high blood pressure. He lived on the 8000 block of Coldwater Canyon Boulevard with his daughters, Ana and Marta, and Ana's son, murder victim Danilo Morales. Witness Alfredo Canales Flores, who is unrelated to victim Manuel Flores, rented a room in the back of Flores's house.[2]

---

[2] To avoid confusion, we refer to victim Manuel Flores as "Flores," witnesses Alfredo Canales Flores as "Canales," Ana Flores as "Ana" and Marta Flores as "Marta."

4

In the early evening on Monday, January 9, 2012, Flores was shopping at an indoor "swap meet" on Sherman Way and Coldwater, not far from his home. When he returned home at about 6:45 p.m., Flores parked his green minivan in the driveway. As he walked from the driveway to his front door, Bonilla, Ortiz and Ramirez accosted Flores. Witnesses described the perpetrators by their relative heights. The evidence established that Ramirez is 5'1"; Ortiz is 5'9"; and Bonilla is 6'1".[3]

The shortest man, Ramirez, took Flores's gold neck chain; the tallest, Bonilla, took Flores's car keys and wallet. As the three defendants were walking away, Flores yelled for help. Ramirez turned around and fired one gunshot at Flores.[4] The shot missed. The three robbers then ran north on Coldwater and turned west onto the 13000 block of Willard Street, where they got into a parked, white Mitsubishi Montero SUV. Meanwhile, apparently in response to his grandfather's call for help, Morales had run out of the house and chased defendants to the Montero. As the Montero was driving away, Morales hit the back window with his hand. There was conflicting evidence as to whether the back window of the Montero was shattered by Morales hitting it, or as a result of the single gunshot fired at Morales from inside the car. Morales died of a single gunshot wound to the head, fired from the back of the Montero.

In addition to victim Flores, there were three witnesses to all or part of the incident: Ana (Morales's mother), Canales (the tenant) and Henry Ruiz (a passerby). Only Ana and Canales saw the fatal shooting. All three witnesses saw the shortest of the three perpetrators, Ramirez, get into the back seat of the getaway car. Ruiz testified he was driving east on the 13000 block of Willard when three men ran past his car and got

---

**3** Applying the well settled rule that we must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence (*Zamudio, supra*, 43 Cal.4th at p. 357), our statement of facts presumes the jury concluded that Ramirez was the perpetrator who witnesses described as the shortest, Bonilla was the tallest, and Ortiz was of medium height.

**4** Police recovered an expended bullet from the area between the wrought iron screen door and the wooden front door of Flores's house.

into a white SUV.  The tallest man, Bonilla, used the front driver's door; the medium height man, Ortiz, used the front passenger door; the shortest, Ramirez, got into the back seat.  Ruiz had already driven past so he did not see the shooting, but he heard a "thud," which caused him to make a u-turn.

Ana told police that she ran outside when she heard her sister, Marta, yelling, "My dad, my dad."[5]  Flores, who was standing in the driveway, said he had been assaulted.  Ana saw Marta and Canales running north on Coldwater.  Canales was chasing the shortest of three men, Ramirez.  Except that they both were taller than Ramirez, Ana could not distinguish the relative heights of the other men, one of whom was running west on Willard and the other standing at the corner of Coldwater and Willard.  As Ana chased after Marta and Canales, she saw the man running west on Willard use the front driver's side door to get into a parked white SUV; the man who had been standing on the corner used the front passenger door to get into the SUV.  After Ana tripped she saw Morales run past Marta and Canales.  The SUV, which had started moving forward, stopped and the short man, Ramirez, got into the back seat on the driver's side.  Morales hit the back window twice with his hand, but did not break the glass.  Ana next heard a gunshot and saw the glass shatter.

Canales's testimony was a little different.  He stated he ran out of his room when he heard Flores yelling.  Seeing Morales chasing three men who were running north on Coldwater, Canales chased after Morales.  Canales was about five meters behind Morales when he saw the man in the back seat of the white SUV, Ramirez, raise his hand and shoot Morales; Canales did not see the gun, but saw a flash.  When Ramirez next moved his arm to point at Canales, Canales dropped to the ground because he thought Ramirez was going to shoot him, too.  Canales recalled that the shooter was wearing beige or gray pants and a hooded jacket over a shirt with black and lighter colored stripes.  Canales

---

[5]     Because Ana was a percipient witness and also wanted to be in the courtroom during the trial, the parties stipulated that a detective could recount Ana's statement to police, which had been recorded.

later identified a photograph of the striped shirt Ramirez was wearing in his booking photograph as looking "pretty much" like the clothing the shooter had been wearing.

Police obtained video from a security camera at a house on Willard Street and from a Verizon store near the swap meet where Flores had been shopping before the robbery, portions of which were shown to the jury. At about 6:39 p.m., the Verizon store video shows a minivan similar to Flores's apparently being followed by a white SUV. Police released to the media a still shot of the white SUV, obtained from the Verizon store video.

The day after the shooting (January 10), Ortiz and Ramirez bought a replacement "back glass" for a 1996 Mitsubishi Montero SUV and a tube of the material used to glue the glass to the car. Edgar Castellanos, the Primo Auto Glass employee who sold them those items, testified he was unable to identify the men who made the purchase in photographs shown to him by detectives a few days later. But the detective who showed Castellanos the photographs testified that, Castellanos stated "something to the effect of, 'They look like the guys, but I'm not a hundred percent sure.'"

On January 12, 2012, Ortiz was driving with his girlfriend, Zayra Alberto, in her Saturn when they were stopped by police, handcuffed, taken to the police station and interviewed. Portions of those recorded interviews were introduced into evidence.

*Ortiz's Statement to Police*: Ortiz told Detectives Steve Castro and Mark O'Donnell that on the day of the shooting, he was driving the Montero when he picked up Bonilla and Ramirez and drove them to the parking lot of a 7-Eleven on Woodman where Alberto had left her inoperable Saturn. After they fixed the Saturn, Ortiz drove Ramirez in the Montero and Bonilla drove the Saturn to a car wash, where both cars were washed. The men next dropped off the Saturn at Alberto's parent's home. Ortiz was driving Bonilla and Ramirez back to the location of his court-ordered community service, where they were going to help Ortiz with his community service, when the Montero broke down. Ortiz summoned a tow-truck to tow the Montero back to his house. Ortiz rode his bicycle back to his community service location while Bonilla and Ramirez went with the tow truck; Ortiz understood they were going to get the parts needed to fix the

7

Montero from a junkyard and would work on it at Ortiz's house. Later that day, upon discovering that his bicycle was stolen, Ortiz took the bus from community service to the Friar Street home he shared with Alberto. Alberto was there when Ortiz arrived home at about 5:15 p.m. Alberto went to the market, then cooked dinner. It is unclear from Ortiz's statement whether Bonilla and Ramirez were at the Friar Street home.

*Alberto's Statement to Police*: Girlfriend Alberto's statement to police differed significantly from Ortiz's. In a two hour interview, Alberto told Officer Josie Torres that Ortiz arrived home at about 7:00 p.m. the night of the shooting, accompanied by Ramirez and Bonilla. Alberto heard the three men whispering together in the bedroom. Ortiz seemed "a little weird," but denied anything was wrong when Alberto asked. The next morning, Alberto saw pieces of broken glass in the driveway. That day, Alberto "freaked out" when she saw a story on Facebook about the murder of someone she vaguely knew from high school; the story included a picture of a car police believed was connected to the murder; that car looked like her Montero. But when she asked Ortiz, he denied any involvement, and Alberto did not press him. Alberto was with Ortiz at a laundromat the next day when she saw a television news story about the murder that included a photograph of a white SUV like her Montero. When Alberto confronted Ortiz, he denied that it was Alberto's Montero. Ortiz also told Alberto not to ask too many questions and the "less you know it's better for you." When Alberto later saw two detectives parked in front of their house, and heard a helicopter overhead, she felt panicked. During the interview, Alberto's handcuff was removed; she was given water, a sandwich and her purse so that she could take her prenatal vitamins.

*Alberto's Testimony:* When called by the prosecution at trial, Alberto's testimony differed significantly from her statement to police. Alberto testified that she was brought to the police station in handcuffs on January 12, and remained handcuffed while she was interviewed for what seemed like eight hours. Because she was afraid, she told the police what she thought they wanted to hear, which was not the truth. Contrary to what Ortiz said to the police, Alberto testified that Ortiz and the Montero were not there when she arrived home at about 7:00 p.m. on the day of the shooting. She was in the kitchen when

8

Ortiz came home several hours later; codefendants Bonilla and Ramirez arrived about half an hour after Ortiz. That night was the last time Alberto ever saw Bonillo or Ramirez. Ortiz drove Alberto to work in the Saturn the next morning (January 10); Alberto did not remember why since she usually drove herself to work. That day, she saw a news story about a murder, which included the picture of a white SUV that looked like her Montero, but she was not concerned. The Montero was there when Alberto arrived home that night and she did not notice anything unusual about it. When Alberto left the police station on January 12, she drove herself home in the Saturn. Alberto was home when two detectives questioned her approximately two weeks later.

The day Ortiz and Alberto were taken into custody (January 12), police executed a search warrant for their home on Friar Street. The Montero, which was parked in the driveway, had tinted side windows but the back window was clear. Ortiz's fingerprints were on the driver's side and passenger side of the Montero, including the driver's side fender and the center hood (Nos. 4, 6, 11, 13, 14, 15, 16 and 19). Ramirez's prints were on the passenger side and on a paper invitation found on the front passenger seat (Nos. 3, 7, 10 and 18). Bonilla's prints were on the outside passenger side and the "passenger side front roof top edge" (Nos. 8 and 7).

When Ramirez was arrested on January 13, 2012, he was wearing a dark jacket over a yellow and brown striped sweatshirt, which was similar to witness Canales's description of the clothing worn by the man who shot Morales. Because it had been four days since the shooting, police did not test Ramirez's clothing for gunshot residue. Ramirez admitted knowing Ortiz and that he had been in the Montero on occasion, but maintained he was not in it on the day of the murder. Ramirez told police that he spent that day working for a man named Jesus at a home in San Pedro; but Ramirez could not recall the man's last name, a street address, the cross-streets or any landmarks to help police identify the location.

Ortiz's cell phone, obtained by police when Ortiz was arrested, had no record of incoming or outgoing telephone or text messages prior to January 11, 2012. But Bonilla's cell phone, recovered when he was arrested about a month later, had two text

9

messages between Bonilla's and Ortiz's cell phones, dated January 10, 2012 (the day after the shooting). The first text reads, "We are going to the honker to grab the door of the little car." The second text reads, "I am going to the house. I think that they have a sealer machine."[6]

There was evidence of several calls between Ortiz's and Bonilla's cell phones beginning about 6:36 p.m. on the day of the murder; some of the calls were connected through a cell phone tower about a half mile from the swap meet. At 7:02 p.m., Bonilla's cell phone made a call using a tower near the house where Ortiz and Alberto lived. Victor Nguyen, an FBI agent with expertise in cell phones, testified defendants' cell phones must have been closer to these towers than any other towers when the calls were made, because if the tower with the best signal is not available, the call will drop out.

## B.     Defense Case

### 1.     Ortiz

Ortiz was the only one of the three defendants to testify. He described codefendant Ramirez as his friend and codefendant Bonilla as his mechanic. In August or September 2011, several months before the shooting, Alberto's Saturn was parked in the driveway and Ortiz's Montero was parked on the street in front of the Friar Street house when Ortiz's brother broke one window of the Saturn and all of the Montero's windows. In late December 2011, Ortiz loaned the Montero to Ramirez, who returned it on January 1, 2012.

On Monday morning, January 9, 2012, the Montero was parked in the driveway of the Friar Street house and the only set of keys was in Ortiz's pocket. That morning, Ortiz walked to the location where he was performing his community service. Ortiz remained there until 5:00 p.m., with a lunch break between noon and 1:00 p.m. He communicated with Bonilla by cell phone several times that morning. Around lunch time, Alberto called Ortiz to tell him the Saturn had broken down in the parking lot of a 7-Eleven on

---

**6**     This is the English translation of the two messages, which were written in Spanish. Ortiz testified that "Honker" is the place where they sell used car parts, like a junkyard.

10

Woodman. Ortiz called Bonilla, told him the keys to the Saturn were under the passenger seat and to go fix it. Ortiz initially testified that he did not go to the 7-Eleven that day. But after seeing photographs taken by a 7-Eleven security camera which shows the Montero in the parking lot at about noon that day, Ortiz testified he could not recall whether or not he was there, or whether he drove the Montero there. Ortiz eventually testified he went to the 7-Eleven to pick up Alberto's car on January 9, 2012.

Ortiz testified that, when he finished his community services at about 5:00 p.m. that day, he took a "pirate taxi" to visit his ex-girlfriend (not Alberto); after discovering she was not there, he took a pirate taxi home, arriving there at about 5:30 p.m. He and Alberto had dinner, then went to bed. The next day (January 10), Ortiz went to community service again. That day, he texted Bonilla to inform him that the door of Alberto's Saturn (i.e. "the little car") was broken. While at community service on January 10 or 11, Ortiz did not tell a coworker that he recently loaned the Montero to someone, that something bad had happened and they returned the car with a broken back window. [7]

After he was arrested on January 12, Ortiz spent about eight hours in a cell before he was moved to an interview room where Detectives Castro and O'Donnell interrogated him. During the interview, he denied being involved in the robbery and murder. The detectives got angry when Ortiz recounted what he been doing that day; they threatened to take away the child he was having with Alberto. Ortiz cried during the interview; he

---

**7** This was a conversation allegedly overheard by Gilbert Martinez, Ortiz's community service supervisor. When Martinez saw news reports of the murder, he recognized the getaway SUV as the Mitsubishi Montero he had seen Ortiz driving. Martinez reported his suspicions to the police. In a recorded interview, Martinez told police he heard Ortiz tell someone that he (Ortiz) loaned the car to a friend, something bad happened and the back window was broken, and he did not know what to do because it was his girlfriend's car. Martinez also stated, "He says he wasn't driving, but I bet, if you go to his house, you'll find the broken window." When Martinez did not comply with subpoenas to testify as a witness at the trial, the trial court issued a body attachment for Martinez, but denied Ortiz's request that it order the detectives to pick up Martinez. The trial court overruled the People's and Ramirez's objection to Ortiz's counsel asking Ortiz about the conversation Martinez overheard.

felt intimidated and afraid. Castro promised to let Ortiz go if Ortiz would say that Ramirez ("the short one") did the shooting. Ortiz came to believe that if he told the detectives what they wanted to hear – which was not the truth – they would let him go. Based on this belief, Ortiz told the detectives what he thought they wanted to hear: Bonilla and Ramirez took the Montero on January 9 while Ortiz returned to his community service location; when Bonilla and Ramirez brought the Montero back, the rear window was broken and they said something bad had happened.

    2.      <u>Ramirez</u>

No gunshot residue was found on the shirt Ramirez was wearing in his booking photograph, the shirt that Canales identified as worn by the man who shot Morales.

William Moore, a Los Angeles Police Department criminalist, analyzed the expended bullets recovered from Morales's body and from the front door of the Flores home. Those two bullets "definitely" did not come from the same weapon. The bullet recovered from Morales' body was a .38 or .357 caliber, most likely fired from a revolver; possibly a Smith and Wesson, Ruger or Taurus. The bullet found at the front door was more likely a .38 caliber, also most likely fired from a revolver; possibly a Taurus, Astra or Charter Arms.

    3.      <u>Bonilla</u>

The parties stipulated that Defense Exhibit No. XX was an accurate copy of the video depicting the 7-Eleven parking lot on Woodman on January 9, 2012. Other defense exhibits introduced into evidence were still photographs taken from that video. A defense cell phone expert contradicted the opinion of the prosecution's expert regarding whether the location of a cell phone can be determined by the location of the cell phone tower used to make a call. Bonilla did not call witnesses.

**DISCUSSION**

*A.    Sufficiency of the Evidence*

    1.    <u>First Degree Felony Murder</u>

Bonilla contends his murder conviction is not supported by sufficient evidence. He argues there is no evidence that he was with Ramirez and Ortiz while they were purportedly stalking Flores before the robbery; he did not match the witnesses' descriptions of the tallest of the three perpetrators and, since he was Ortiz's mechanic, his fingerprints on the Montero are insufficient to connect him to the crime. Ortiz and Ramirez purport to join in the sufficiency of the evidence contention. We find no error.

The standard of review for a challenge to the sufficiency of the evidence is well settled. We must review the whole record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the jury could reasonably have deduced, to determine whether there is evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Zamudio, supra*, 43 Cal.4th at p. 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid.*) The standard is the same where the prosecution relies primarily on circumstantial evidence. "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Id*. at pp. 357-358.)

13

That defendants were together from about noon until after 7:00 p.m. on the day of the murder can be deduced from the 7-Eleven security camera photographs which placed the Montero in the parking lot of the 7-Eleven at about noon that day. Ortiz's statement to police that Bonilla and Ramirez were passengers in the Montero when Ortiz arrived at the 7-Eleven was sufficient to establish that all three were there. Ortiz's statement is corroborated by the presence of Bonilla's and Ramirez's fingerprints on the Montero. At 6:39 p.m. – not long before Bonilla and Ramirez arrived home with Ortiz – a security camera at the Verizon store near the swap meet where Flores was shopping captured an image of the Montero apparently following Flores's van from the swap meet to his home. That all three defendants were in the Montero can be inferred from Alberto's statement to police that the three men arrived at the Friar Street house together at about 7:00 p.m., shortly after the murder. Alberto's statement is corroborated by the evidence that Bonilla's cell phone made a call using a tower near the house at 7:02 p.m. that night. A reasonable inference from this evidence is that the three defendants were together during the time of the robbery and related shootings.

We find unpersuasive Bonilla's argument that his fingerprints on the Montero are insufficient to show he was in the Montero at the relevant time because, as Ortiz's car mechanic, his fingerprints would likely be on Ortiz's car. Ortiz told police the three men were together when they took the Saturn and the Montero to a car wash in the mid afternoon on January 9. From this evidence, it is reasonable to infer that Bonilla's and Ramirez's fingerprints must have been placed on the Montero sometime after the car was washed. Alberto's statement to police that defendant, Bonilla and Ramirez arrived at the Friar Street house together at about 7:00 p.m. on night of the murder also connects Bonilla and Ramirez to the Montero that day. From Alberto's statement to police that she never saw Bonilla and Ramirez again after January 9, it is reasonable to infer that their fingerprints were placed on the Montero that day.

That Bonilla's appearance differs from the descriptions of the "tallest" man who took Flores' wallet and was seen running from the scene, does not require reversal. Flores told the police that the man who took his wallet, the tallest of the three men, was

14

between 19 and 21 years old, weighed about 165 pounds and was between 5'9" and 5'11" tall. Canales estimated that the tallest man was 21 years old. Bonilla is the tallest of the three defendants. In 2012, he was 27 years old, weighed 240 pounds and was 6'1" tall. That Bonilla is older, heavier and taller than witness estimated does not require reversal because such conflicts in the evidence are for the jury to decide, not the appellate court. (*Zamudio, supra*, 43 Cal.4th at p. 357.)

### 2. The Felony-Murder Special Circumstance

Defendants contend insufficient evidence supports the felony murder special circumstance finding. They argue there was insufficient evidence that they acted with either an intent to kill or reckless indifference to human life. We disagree.

The penalty for a defendant found guilty of first degree murder is life in prison without the possibility of parole if any one of the "special circumstances" listed in section 190.2 (the special circumstance statute) is found true. Relevant here is section 190.2, subdivision (a)(17)(A), which identifies as a special circumstance the commission of a murder while the defendant was "engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" a robbery.

It is undisputed that the special circumstance statute applies to aiders and abettors of first degree murder. (*People v. Banks* (2015) 61 Cal.4th 788, 797-798.) In the case of aiders and abettors to first degree felony murder, section 190.2, subdivision (d) provides: ". . . [E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, . . . or assists in the commission of [an enumerated] felony . . . which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special

15

circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."**8**

Section 190.2, subdivision (d) "imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks, supra*, at p. 798.) Since Ortiz does not challenge the sufficiency of the evidence to support a finding that he was a major participant in the crime, we focus our analysis only on the mens rea requirement.

As it "stood in 1990, state law made only those felony-murder aiders and abettors who intended to kill eligible for a death sentence. [Citation.]" (*Banks*, *supra*, 61 Cal.4th at p. 798.) But in June 1990, the voters passed Proposition 115, which revised section 190.2, subdivision (d) such that it brought the state law in conformity with the United States Supreme Court's "most recent word on capital punishment for involvement in felony murders. [Citations.]" (*Banks, supra*, at p. 798.) Revised section 190.2, subdivision (d) codified the holding in *Tison v. Arizona* (1987) 481 U.S. 137, that " 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient' " to satisfy the prohibition against cruel and unusual punishment in the context of the death penalty. (*Id*. at p. 800; see also *Kennedy v. Louisiana* (2008) 554 U.S. 407, 421 [suggesting capital punishment is permitted for nonkillers whose " 'involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.' "].)

---

**8** Section 190.2, subdivision (c) reads: "Every person, not the actual killer, who, with the intent to kill, aids, abets, . . . or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." Under subdivision (c), "aiders and abettors who act with the intent to kill become death eligible whether or not their conduct makes them major participants in the crime. (§ 190.2, subd. (c).)" (*Banks, supra*, at p. 798, fn. 4.) Here, as in *Banks*, the prosecution relied exclusively on the theory that Ortiz was a major participant who acted with reckless indifference to human life. For this reason, we need not analyze subdivision (c)'s application to this case.

16

Knowing participation in an armed robbery is, by itself, insufficient to establish the reckless indifference to human life element of section 190.2, subdivision (d). (*Banks, supra*, 61 Cal.4th at p. 808.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum. [Citation.]" (*Ibid*.) Rather, "[r]eckless indifference to human life 'requires the defendant be "subjectively aware that his or her participation in the felony involved a grave risk of death." ' [Citation.]" (*Id. at* p. 807.)

*Banks* offers further guidance. In that case, the evidence established that Matthews, Gardiner and Daniels were members of the same criminal street gang; Banks was not a member of that gang. Sometime before 3:45 p.m. on October 1, Banks and Gardiner forced their way into a medical marijuana dispensary at gun point; they and Daniels tied up the employees and searched the premises; a security guard was killed in a gun battle with the three perpetrators as they were leaving the dispensary; about a block from the dispensary, Matthews was seen driving around the corner in an SUV registered to Banks; Matthews slowed down when Daniels called out his name; Daniels and Gardiner jumped in the SUV, which drove away; Banks was on foot when he was stopped a few blocks away from the dispensary; Matthews was the sole occupant of the SUV when he was stopped later that day; cell phone records showed several calls between Matthews' and Banks' cell phones between 3:00 and 4:00 p.m.; Matthews was wearing a Global Positioning System (GPS) which showed he was on the block containing the dispensary at 2:51 p.m., three blocks away from 3:00 to 3:45 p.m., and moved toward the dispensary over the next few minutes. (*Banks, supra*, 61 Cal.4th at pp. 794-795.) Matthews was convicted of first degree murder, burglary and robbery; the jury found true a felony-murder special circumstance and he was sentenced to life in prison without possibility of parole. (*Id*. at p. 797.)

The *Banks* court found this evidence insufficient to support the special circumstance finding as to Matthews. It reasoned that there was no evidence that Matthews had any role in planning the robbery or procuring the weapons; no evidence that Matthews, Gardiner or Daniels had previously committed murder, attempted murder,

17

or any other violent crime; Matthews was not at the scene of the robbery and there was no evidence he saw or heard the shooting, could have seen or heard the shooting, that he had any immediate role in instigating it or could have prevented it. "On this record, Matthews was, in short, no more than a getaway driver, guilty . . . of 'felony murder simpliciter' [citations] but nothing greater. As such, he is ineligible for the death penalty under *Tison* and *Enmund* [*v. Florida* (1982) 458 U.S. 782]. Because section 190.2(d) incorporates the *Tison–Enmund* standard, if the evidence was also insufficient to make Matthews death eligible under these cases, the evidence was also insufficient to find the special circumstance true and Matthews eligible for life imprisonment without parole under state law." (*Banks, supra*, 61 Cal.4th at p. 805.)

The evidence in this case differs significantly from that in *Banks*. Unlike Mr. Matthews, here Bonilla, Ortiz and Ramirez were all at the scene of the Flores robbery. After Ramirez shot at Flores, all three defendants knew that a co-perpetrator had a gun and was willing to use it to make good their escape; none of them abandoned the crime. Instead, they all jumped into the getaway car and while they were fleeing with the fruits of the robbery, Ramirez shot and killed Morales. Under *Banks,* this evidence was sufficient to support the felony murder special circumstance because the jury could reasonably infer that each defendant continued his participation in the crime even after he was " ' "subjectively aware that his or her participation in the felony involved a grave risk of death." ' [Citation.]" (*Banks, supra*, 61 Cal.4th at p. 807.)

B.      *Admissibility of the Cell Phone Expert's Evidence*

Bonilla contends he was denied due process by the trial court's ruling that allowed Nguyen, the People's cell phone expert, to testify over defense objection. He proffers four reasons: (1) the prosecution violated its constitutional duty, as set forth in *Brady v. Maryland* (1963) 373 U.S. 83, by not timely producing all documents relied upon by Nguyen in forming his expert opinion before the trial began; (2) the failure to produce those documents violated section 1054.1; (3) the prosecutor violated section 1054.7 by failing to immediately disclose to defendants a conversation Nguyen had with a Sprint radio frequency engineer during the trial; and (4) introduction of the mid-trial

18

conversation violates *Crawford v. Washington* (2005) 541 U.S. 36 (*Crawford*). We find no error.

The trial court conducted an Evidence Code section 402 hearing on the admissibility of Nguyen's testimony. Nguyen's opinion was based on having used a particular computer program to determine the location where a phone will switch from one tower to the next to get the strongest signal. During the course of the hearing, it came to light that there may have been e-mails between Nguyen and "case agents" which had not been produced to defendants in pretrial discovery. Defendants objected to evidence from Nguyen under the state and federal constitutions, as well as section 1054. The trial court ordered any discoverable material turned over forthwith, and denied further relief.

Nguyen had not completed his trial testimony when defense expert Norman Clark, a Sprint employee, took the stand. Clark testified that the call from Ortiz's phone may have been using a back up tower when it pinged off the tower near the swap meet. From that evidence, defendants sought to draw the inference that the phone may have been further away from the swap meet than Nguyen's testimony suggested. Defendants objected when, upon redirect, Ngyuen testified that he contacted a Sprint radio frequency engineer after hearing Clark's testimony. In an offer of proof, the prosecutor explained Nguyen was going to testify that the Sprint engineer confirmed that Clark was wrong and Nguyen was correct that, "if the best signal in the coverage area is not available, the call does not go through." Defendants argued the failure to disclose Nguyen's conversation with the Sprint engineer that morning rendered admission of the evidence unfair because it deprived defendants of the opportunity to make a "tactical decision how to address it and not look like buffoons by this having been laid out on redirect." Defendants did not object on general hearsay or Sixth Amendment grounds. The trial court overruled the "unfairness" objections but ordered the prosecutor to provide defendants with information about who Nguyen had contacted. In turn, defendants were ordered to disclose to the prosecution to whom Clark spoke "to get his information." We find no error.

1.     The E-Mails and "*Brady* Error"

The People have a constitutional and statutory duty to disclose to the defense information " '[that is] both favorable to the defendant and material on either guilt or punishment. . . . [¶]  Evidence is "favorable" if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses.  [Citation.]  [¶]  Evidence is "material" ". . . if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." '  [Citations.]" (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 348, citing *Brady*.)

Defendants have not shown that the e-mails were favorable to the defense.  As such, they have failed to show they were denied due process as a result of the prosecution's failure to turn the e-mails over in pretrial discovery.

2.     The E-Mails and Section 1054

The People's statutory duty to disclose is imposed by section 1054 et seq., and is not limited to favorable evidence.  Section 1054.1 requires the prosecution to disclose to the defense, among other things, ". . . any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial." (§ 1054.1, subd. (f).)  If discovered by the prosecution less than 30 days before trial, discoverable information must be disclosed to the defense "immediately." (§ 1054.7.)

"The trial court has broad discretion to fashion a remedy in the event of a discovery abuse to ensure that the defendant receives a fair trial.  [Citation.]  [It] may enforce the discovery statutes by ordering 'immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.' (§ 1054.5(b).)" (*People v. Bowles* (2011) 198 Cal.App.4th 318, 325-326.)  The trial court's broad discretion to impose discovery sanctions is not unfettered. (*People v. Superior Court (Mitchell)* (2010) 184 Cal.App.4th 451, 459.)  For example, it may prohibit the testimony of a witness only after the exhaustion of all lesser sanctions. (§ 1054.5, subd. (c).)

20

Here, defendants made an express section 1054 objection to Nguyen's testimony based on the prosecution's failure to produce e-mails between Nguyen and "case agents" relating to his expert opinion. Although not specified, we understand defendants to have been seeking an evidence preclusion sanction. But evidence preclusion is only available after the exhaustion of all lesser sanctions, which includes immediate disclosure and a continuance.

The trial court in this case ordered the e-mails produced. Nothing in the record suggests the prosecution did not comply with that order. Defendants did not seek a continuance so that they could access any of that information or to develop contrary evidence. Under these circumstances, the trial court did not err in admitting Nguyen's testimony over defense objection.

### 3. The Mid-Trial Conversation and Section 1054

Although defendants did not reference section 1054 in their objections to evidence of Nguyen's mid-trial conversation with the Sprint engineer, we also understand their "unfairness" objection as seeking an evidence preclusion sanction for the prosecution's failure to immediately disclose to defendants that conversation. (§ 1054.5.)

As with the e-mails, nothing suggests the prosecution did not comply with the trial court's order to provide defendants with information about the Sprint engineer to whom Nguyen spoke mid-trial. Defendants did not seek a continuance to evaluate that evidence or to develop contrary evidence.

### 4. The Mid-Trial Conversation, *Crawford* and the Right to Confrontation

In 2004, the United States Supreme Court held that "the admission of testimonial out-of-court statements violates a defendant's confrontation rights unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. [Citation.]" (*People v. Valadez* (2013) 220 Cal.App.4th 16, 30, citing *Crawford.*) At their 2013 trial, defendants did not object to evidence of Nguyen's conversation with the Sprint engineer under *Crawford* or other hearsay-related grounds. The failure to do so constitutes forfeiture of the issue on appeal. (*People v. Neely* (2009) 176 Cal.App.4th 787, 794.)

21

That the issue of whether a defendant's Sixth Amendment right to confrontation is violated by an expert's reliance on testimonial hearsay is currently pending before the California Supreme in *People v. Sanchez* (2014) 223 Cal.App.4th 1 (review granted May 14, 2014, S216681) and *People v. Archuleta* (2014) 225 Cal.App.4th 527 (review granted June 11, 2014, S21840) does not compel a contrary result. Until the court decides those cases, there has been no change in the law that defendants could not have known about, which would excuse their failure to object.

C.     *Instructional Errors*

    1)     <u>Instructions Distinguishing Between the Direct Perpetrator and Aiders and Abettors</u>

Although he did not object in the trial court, Ramirez contends on appeal that the jury instructions improperly suggested that the trial court believed Ramirez was the direct perpetrator of the charged crimes and that Ortiz and Bonilla merely aided and abetted Ramirez.[9] For example, Ramirez complains the trial court instructed: "[Ramirez] is charged in count 1 with the murder under a theory of felony murder." But instructed: [Ortiz and Bonilla] may also be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator." As we understand his argument, it is that the failure to identify Ramirez as a potential aider and abettor (only Bonilla and Ortiz were so identified) somehow suggested to the jury that the trial court believed Ramirez was not just the alleged direct perpetrator, but that he was in fact the unnamed direct perpetrator referred to in the aiding and abetting instructions, thus improperly shifting to Ramirez the burden of proving that he was not. At oral argument, the Attorney General acknowledged that the trial court's inclusion only of Ortiz and Bonilla by name in the aiding and abetting instructions was "unorthodox."

---

[9]     This section of Ramirez's Opening Brief is headed: "The Jury Instructions Specifically Naming [Ramirez] As the Perpetrator and Shooter . . . ." That heading is misleading because no instruction, including the aiding and abetting instructions, identified Ramirez as the perpetrator and/or shooter. The aiding and abetting instructions all referred to an unnamed perpetrator.

" '[T]he proper test for judging the adequacy of instructions is to decide whether the jury was fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1418.) But a " ' "party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." [Citations.]' " (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849, italics omitted.) Since Ramirez does not challenge the legal correctness of any of the instructions of which he now complains, he has forfeited the issue. (*Id*. at pp. 849 et seq.)

Even assuming the issue was not forfeited, Ramirez has cited to no authority, and our independent research has found none, holding it is always improper, in a joint trial of the direct perpetrator and aiders and abettors of the a crime, to give instructions that distinguish between the prosecution's different theories of culpability. Finally, any error was harmless. The jury was instructed: "Do not assume just because I give a particular instruction that I am suggesting anything about the facts." (CALCRIM No. 200.) Regarding first degree murder and the felony murder special circumstances, jurors were instructed in relevant part as follows:

- A person may be guilty as a direct perpetrator of the crime or as an aider and abettor. (CALCRIM No. 400.)
- To prove defendants Ortiz and Bonilla were guilty of a crime based on aiding and abetting, the People had to prove the perpetrator committed the crime, the defendant knew the perpetrator intended to commit the crime, the defendant intended to aid and abet the perpetrator, and the defendant did in fact aid and abet the perpetrator. (CALCRIM No. 401.)
- Defendant Ramirez was charged with first degree murder under a theory of felony murder, which required proof that he committed robbery, intended to commit robbery and "while committing robbery, the defendant caused the death of another person." (CALCRIM No. 540A.)
- If the jury found "a defendant" guilty of first degree murder, it had to also decide whether the felony murder special circumstance was true; the jury

23

was instructed to consider the special circumstance separately for each defendant.  (CALCRIM No. 700.)

- To prove the felony murder special circumstance, the People had to "prove that:

    1.  The defendant *committed, or aided and abetted* robbery;

    2.  The defendant *intended to commit, or intended to aid and abet* the perpetrator in committing robbery;

    3.  If the defendant did not personally commit robbery, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed robbery;

    4.  Defendant Rene Ramirez did an act that caused the death of another person;

    5.  The act causing the death and the robbery were part of one continuous transaction; AND

    6.  There was a logical connection between the act causing the death and the robbery."  (CALCRIM No. 703.)

Thus, the jury was instructed fully on the applicable law. The instructions did not shift the burden of proof to any defendant and did not suggest the trial court had an opinion on whether any defendant was a perpetrator or an aider and abettor.  Ramirez has not shown it is probable that a jury instructed without reference to the names of the defendants would have found him not guilty under the same aiding and abetting theory that resulted in guilty verdicts for Bonilla and Ortiz, or at all.

### 2) Instructions on Second Degree Murder

Defendants contend it was error to deny a defense request for instructions on second degree murder as a lesser included offense of felony murder.  They argue second degree murder was a lesser included offense of felony murder under the accusatory pleading test and there was sufficient evidence from which the trier of fact could find the Morales murder did not occur during the commission of the Flores robbery.  We disagree.

24

Even in the absence of a request, the trial court must instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but not when there is no evidence that the offense was less than that charged. (*People v. Banks* (2014) 59 Cal.4th 1113, 1159, overruled on another point in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) It is first degree murder if it is perpetrated in any manner specified in section 189. Section 189 specifies a murder committed in the perpetration of a robbery as first degree murder. (§ 189.) "When an officer or citizen is murdered while in immediate pursuit of a robber who flees from the scene of the crime with the fruit of that offense, the killing is in perpetration of the robbery — a crime that is not legally complete until the robber has won his or her way even momentarily to a place of temporary safety." (*People v. Johnson* (1992) 5 Cal.App.4th 552, 559.) In contrast, any murder that is not perpetrated in one of the manners specified in section 189 is second degree murder. (§ 189.)

Second degree murder may be, but is not always, a lesser included offense of first degree murder. There are two tests for determining whether an offense is a lesser included offense within a greater offense: (1) the statutory elements test and (2) the accusatory pleading test. (*People v. Banks, supra*, 59 Cal.4th at p. 1160.) Whether second degree murder is a lesser included offense of felony murder under the statutory elements test is an unresolved question. (See *People v. Anderson* (2006) 141 Cal.App.4th 430, 444 [assuming for the sake of argument that second degree murder is not a lesser included offense of felony murder.) But our Supreme Court has recently held that second degree murder may be a lesser included offense of felony murder under the accusatory pleading test depending on the nature of the murder allegations. (*People v. Banks, supra*, at p. 1160.)

For purposes of the accusatory pleading test, a lesser offense is included in the greater offense if "the facts actually alleged in the pleading, include all elements of the lesser offense, such that the greater cannot be committed without also committing the

lesser." (*People v. Banks, supra*, 54 Cal.4th at p. 1160*, internal citations and quotation omitted.) In *Banks*, the accusatory pleading alleged the defendant "willfully, unlawfully, and with malice aforethought murdered" the victim and also alleged the murder occurred during the commission of a felony within the meaning of section 190.2(a)(17). (*People v. Banks, supra*, 59 Cal.4th at p. 1157.) The court found second degree murder was a lesser included offense of felony murder under the accusatory pleading test because the murder count alleged both felony murder and that the murder was committed willfully and maliciously. It found further that the failure to instruct on second degree murder was error (albeit harmless), because evidence that the defendant argued with the victim before shooting him and did not take any property or money from the victim after the shooting supported an inference that the killing did not occur during a robbery but was committed willfully and maliciously, matching the elements of second degree murder. (*Id*. at p. 1161.)

But *Banks* notes the general rule that there is no duty to instruct when there is no evidence that the offense was less than that charged. (*People v. Banks, supra*, 59 Cal.4th at p. 1159.) Thus, *Banks* does not change the rule, reiterated recently in *Anderson, supra,* 141 Cal.App.4th at page 448, that " 'When the evidence points indisputably to a homicide committed in the course of a felony listed in section 189 of the Penal Code, the court is justified in advising the jury that the defendant is either innocent or guilty of first degree murder.' [Citations.]"

The accusatory pleading in this case is substantially the same as the pleading in *Banks*. The only difference is the absence of "willfully" in the pleading before us. Thus, under *Banks*, second degree murder was arguably a lesser included offense of felony murder under the accusatory pleading test in this case. Even so, the trial court had no duty to instruct on second degree murder because in this case, unlike in *Banks*, there was no evidence from which a reasonable trier of fact could infer the Morales murder did not occur during the commission of a robbery. The trial court so noted during discussion of whether to give a second degree murder instruction. The undisputed evidence was that Morales was killed while he was in immediate pursuit of the three robbers as they fled the

26

scene with the fruits of the robbery. On this record, the trial court did not err in refusing to instruct on second degree murder because, under *Anderson*, the evidence pointed indisputably to a homicide committed in the course of a robbery.

   3)  <u>Accessory Instruction</u>

   Bonilla contends it was error to deny his requests for an accessory instruction. He argues the evidence of text messages between his and Ortiz's cell phones establishes no more than that he helped Ortiz replace the shattered back window of the getaway car the day after the robbery and murder. We find no error.

   Because murder can be committed without an accessory after the fact, the crime of being an accessory to murder is not a lesser included offense within the crime of murder. (*People v. Jennings* (2010) 50 Cal.4th 616, 668.) To the extent accessory after the fact may be a lesser related offense of murder, Bonilla had no right to an instruction on that crime, even if he requested it and there was evidence to support it, because the prosecutor would not agree to it. "California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties. [Citations.]" (*Ibid.*)

   Nor are we persuaded that Bonilla had a right to the instruction under the federal law. The United States Supreme Court has held that there is no constitutional right to instructions on lesser related offenses. (*Hopkins v. Reeves* (1998) 524 U.S. 88, 97-98.) Bonilla's reliance on cases from the Ninth Circuit do not compel a contrary result because this court "is ' "not bound by a federal circuit court opinion." ' [Citation.]" (*Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 589.)

   4)  <u>Alibi instruction</u>

   We find no merit in Ramirez's contention that it was error to condition his mid-deliberation request for an alibi instruction (CALCRIM No. 3400) on the jury also being instructed on consciousness of guilt (CALCRIM No. 371).

   **a. The Procedural Background**

   During deliberations, the jury asked for a read back of Detective O'Donnell's testimony relating to Ramirez's alibi. After this was done, defendants asked the trial

court to give CALCRIM No. 3400, which had not previously been requested. The court reviewed the instruction and noted it did not have a sua sponte duty to give it. After some discussion, the trial court said it would give CALCRIM No. 3400, but would also give Alternative B from CALCRIM No. 371, which, like CALCRIM No. 3400, had not previously been requested.

After the trial court announced its intention to also give Alternative B of CALCRIM No. 371, Ramirez withdrew his request for CALCRIM No. 3400. Noting that Bonilla had not introduced any alibi evidence, Bonilla indicated he was not requesting the instruction. And Ortiz stated he was not requesting the additional instruction because, based on the jury's question "the jury already knows that an alibi exists, and that it could create reasonable doubt." Accordingly, the trial court did not give CALCRIM No. 3400.

### b. The Instructions

CALCRIM No. 371 is entitled: "Consciousness of Guilt: Suppression and Fabrication of Evidence." CALCRIM No. 371 gives four alternative instructions. Relevant here are Alternatives A (which was given) and B (which was not given). CALCRIM No. 371, Alternative A, which was given, reads:

> "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

CALCRIM No. 371, Alternative B, which was not requested or given, reads:

> "If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

The alibi instruction that the trial court did not give is CALCRIM No. 3400, which in relevant part reads:

"The People must prove that the defendant committed ____. The defendant contends he did not commit these crimes and that he was somewhere else when the crimes were committed. The People must prove that the defendant was present and committed the crimes with which he is charged. The defendant does not need to prove he was elsewhere at the time of the crime. [¶] If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find him not guilty."

The trial court has no sua sponte duty to instruct on alibi. (*People v. Alcala* (1992) 4 Cal.4th 742, 803-804; *People v. Freeman* (1978) 22 Cal.3d 434, 437–439.) Because there may have been tactical reasons for defense counsel not to focus the jury's attention on alibi evidence, counsel on this record was not necessarily ineffective in failing to request alibi instructions in the initial set of instructions given to the jury. (*People v. Carrasco* (2014) 59 Cal.4th 924, 990.)

### c. Analysis

Although on appeal, defendants characterize the issue as the trial court erroneously denying their belated request that CALCRIM No. 3400 be given, that is not what happened. The trial court agreed to give the instruction conditionally. Ramirez then withdrew his request because the court indicated its intent to give CALCRIM No. 371 Alternative B in addition. The other defendants confirmed that they were not requesting the instruction. We observe that Ramirez does not argue that Alternative B was not a correct instruction or that it was not supported by the evidence.

We are not persuaded by Ramirez's argument that he withdrew the request because of the trial court erred in stating its intention also to give Alternative B of CALCRIM No. 371. Ramirez implies he only withdrew his request for CALCRIM No. 3400 under duress. Ramirez complains the trial court intended to give Alternative B of CALCRIM No. 371 to punish defendants for not requesting CALCRIM No. 3400 during pre-deliberation discussion of jury instructions, and there was no "symmetry" between CALCRIM No. 3400 and Alternative B of CALCRIM No. 371.

As we see it, Alternative A, which was given, was relevant to the evidence that Ortiz told his girlfriend, Alberto, not to ask any questions and the less she knew the

better, etc. Alternative B, which could have been given but was not, is relevant because, if the jury ultimately did not believe Ramirez's alibi evidence, it could use the false alibi as consciousness of guilt evidence.

Although the prosecution did not request Alternative B in the pre-deliberation discussion of jury instructions, neither did the defense request CALCRIM No. 3400. Giving CALCRIM No. 3400 mid-deliberation would put unwarranted focus on the alibi evidence. As such, it was not unfair to defendants to put the alibi evidence in greater context. We see nothing to suggest the trial court's election to give Alternative B of CALCRIM No. 371 along with CALCRIM No. 3400 was intended to punish defendants for the late request. As we see it, the trial court's intention was to avoid a unilateral benefit and that Alternative B was appropriate to the alibi evidence in full context. We find no error.

D.     *Juror Misconduct*

During trial, defendants moved for mistrial and removal of Juror Nos. 4, 7 and 12 based on juror misconduct. These motions were denied. After trial, defendants moved for disclosure of jurors' identifying information for the purpose of preparing a new trial motions based on juror misconduct. That motion was also denied. Defendants' subsequent motions for new trial, based in part on juror misconduct, were also denied. They appeal from those orders. We find no error.

1.     The Misconduct

The jury began deliberating at 11:34 a.m. on October 28, 2013 (Monday). On October 31, 2013 (Thursday), they informed the trial court they had come to a unanimous decision on some counts, but were deadlocked on others. When questioned in open court the next day (Friday, November 1), only Juror Nos. 9 and 10 thought a unanimous verdict on all counts was still possible; the other 10 jurors believed they were hopelessly deadlocked. The trial court ordered the jury to return to the jury room and to think about whether there was anything the trial court could do to help them. Outside the presence of the jury, the trial court informed counsel it had received notes from Juror Nos. 9 and 10.

30

These were the only two jurors who believed further deliberations would be useful. Relevant here is Juror No. 10's note, which read:

"We are so close to a unanimous decision, and I mean close. . . . [One juror] came in with a written statement and read it in the morning before completion of our deliberation. It was a set mind and no room for discussion regarding their decision. Not following the rules of keeping an open mind during all deliberations is not right. Maybe defining the reasonable [sic] and reasonable doubt should be addressed again." [10]

Noting its duty to investigate any potential misconduct, the trial court proposed to begin by questioning the foreperson (Juror No.7), outside the presence of the other jurors "in very general terms about the nature of the 'written statement.' " Defendants did not object. While Juror No. 7 was being questioned outside the presence of the other jurors, it became apparent that Juror No. 7 was the author of the "written statement" and was the alleged non-deliberating juror.[11]

Specifically, Juror No. 7 said she wrote some notes describing the way she was thinking about the evidence and the counts, and read those notes to the other jurors. She explained that writing notes was her way of clarifying her thoughts and reading it was her way of clearly communicating her thoughts to the other jurors. In the course of questioning by the trial court, Juror No. 7 also said jurors were using profanity, speculating about whether the defendants were rich or poor, and discussing the negative connotations of Ramirez's nickname, "Demi." More significantly, she disclosed that another juror, Juror No. 12, at the request of some jurors, had researched the definition of "hung jury" online and had announced his findings to the other jurors. The focus of the misconduct inquiry then shifted to potential misconduct by Juror No. 12.

Questioned outside the presence of the other jurors, Juror No. 12 said he looked up "hung jury" on Wikipedia while in the jury room because other jurors were speculating

---

[10]    Juror No. 9's note reads: "I would like a better understanding of beyond a reasonable doubt and clarification of 'circumstantial evidence.' " There was no mention of the written statement referred to in Juror No. 10's note.

[11]    Juror No. 7's "written statement" is in the Augmented Clerk's Transcript.

31

about what it meant; he read the relevant part of the article out loud to the other jurors. But when another juror said they were not supposed to be doing research, he stopped.

Bonilla, joined by Ortiz, moved for a mistrial on the theory that the entire jury aided and abetted in the misconduct by asking Juror No. 12 to look up "hung jury" on his smart phone. At the least, defendants argued, Juror No. 12 should be excused for misconduct. Defendants did not then ask for the juror who was allegedly not deliberating, Juror No. 7 to be excused. Ramirez joined in the mistrial motion "or in the alternative, get more information from individual jurors about this one issue."

The trial court indicated it was disinclined to remove Juror No. 12 or grant a mistrial, but that it would continue its investigation into the misconduct. It then interviewed each juror individually, outside the presence of the other jurors, both as to whether Juror No. 7 was refusing to deliberate and about Juror No. 12's online research. Several jurors expressed frustration that Juror No. 7 had come to a fixed decision after four days of deliberation  Although some jurors expressed unawareness of the incident, most reiterated the information that Juror No. 12 had looked up the definition of "hung jury" online, and read the results out loud to the other jurors. In addition, Juror No. 4 said he had used his smart phone to Google "hung jury" that morning, and showed the article on his smart phone to Juror No. 9; Juror No. 4 did not know that anyone else had engaged in similar research. The trial court had the following colloquy with Juror No. 9, the juror to whom Juror No. 4 said he showed his smart phone: "**THE COURT**: Okay. To your knowledge, did anyone look at any outside resource to get any information about what a hung jury means? [¶] **JUROR No. 9**: There was – I think there was more discussion than questions. Specifically there was discussion and because of my background, I questioned do you think that really is – [¶] **THE COURT**: Okay. Your background is in the law. You worked as a legal secretary, including in criminal law. [¶] Have you been telling the jurors anything about criminal law that isn't contained in the instructions already? [¶] **JUROR No. 9**: I'm not a lawyer, and I know that I have no position to state anything about the law because I have no certification to advise anyone about the law, and I am very careful that I do not do that, have not done that. [¶] **THE COURT**:

32

All right.  Has anyone been talking about penalty or punishment back there?  [¶]
**JUROR No 9**:  You know, there was some consideration about penalty.  And I personally spoke up and said 'we're not to consider penalty.  That is not our job.  Our job is to decide on the evidence.' "

After the trial court had interviewed all 12 jurors, Ortiz and Bonilla renewed their mistrial motions; alternatively they moved that Juror Nos. 4, 7 and 12 (but not Juror No. 9) be excused for misconduct.  The trial court denied the motions, finding an admonition to disregard the "hung jury" information would be sufficient to cure any prejudice arising from the conduct by Juror Nos. 4 and 12.  The trial court also stated its intention to confiscate the jurors' cell phones.[12]  Implicit in this ruling is a rejection of the allegation that Juror No. 7 was "not deliberating."

    2.    <u>Legal Principles Governing Motions to Excuse Jurors and for Mistrial</u>

The trial court " 'must conduct a sufficient inquiry to determine facts alleged as juror misconduct "whenever the court is put on notice that good cause to discharge a juror may exist." ' [Citation.]" *(People v. Jenkins* (2000) 22 Cal.4th 900, 985.)  Whether misconduct occurred is a question of fact which we review for substantial evidence.  Under that standard, we " 'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.)

If supported by substantial evidence of misconduct, we review for abuse of discretion the decision whether to discharge the juror as opposed to giving an admonition. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474, declined to follow on another ground in *People v. Thompson* (2010) 49 Cal.4th 79, 137.)  Prejudice is presumed from a showing of misconduct, but the presumption can be rebutted by proof that there was no actual prejudice. (*People v. Pierce* (1979) 24 Cal.3d 199, 207.)  Whether " 'a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested

---

**12**      The record is silent on whether cell phones were in fact confiscated.

with considerable discretion in ruling on mistrial motions.' [Citation.]" (*Jenkins, supra*, 22 Cal.4th at p. 986.)

As we discuss below, substantial evidence supports the trial court's finding that Juror No. 7 did not commit any misconduct, and that it was not an abuse of discretion to find no incurable prejudice from the misconduct committed by Juror Nos. 4 and 12.

### a. Juror No. 7

Juror No. 7 allegedly refused to deliberate in part because she read a written statement to the other jurors.

To establish misconduct based on non-deliberation, there must appear "a ' "demonstrable reality" that the juror is unable or unwilling to deliberate. [Citations.]' [Citation.]." (*People v. Barber* (2002) 102 Cal.App.4th 145, 152.) It requires a showing that the juror " 'will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.' " (*People v. Karapetyan* (2003) 106 Cal.App.4th 609, 618.)

Standing alone, the statement by one or more jurors that another juror is not deliberating is not sufficient to show misconduct based on non-deliberation because jurors "will sometimes make the mistake of concluding that a juror's strong disagreement with the majority is equivalent to a refusal to deliberate. [Citation.]" (*Barber, supra*, 102 Cal.App.4th at p. 152.) That a juror does not deliberate well, relies on faulty logic or analysis, disagrees with the majority as to what the evidence shows, or how the law should be applied, does not constitute a refusal to deliberate and is not a ground for discharge. (*Ibid.*) " '[A] juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views. [Citation.]' [Citation.]" (*Id.* at p. 153.)

34

Here, substantial evidence supports a finding that Juror No. 7 did *not* refuse to deliberate. Deliberations began on Monday, October 28 and the misconduct interviews occurred on Friday, November 1. During those interviews, Juror Nos. 4 and 6 said everyone was deliberating. Juror Nos. 2 and 8 said everyone deliberated in the beginning, but by Thursday, some people had made up their minds. Juror No. 3 believed everyone deliberated in the beginning, but Juror No. 7's opinion had become "set in stone." Juror No. 9 said Juror No. 7 stopped talking late on Thursday, but started talking again on Friday morning. Juror No. 10 said Juror No. 7 read a written statement explaining her conclusions on Thursday morning and said she was not going to change her mind. Juror No. 5 believed Juror No. 7 had made up her mind on Thursday and was no longer listening to other jurors who were trying to respond to her "doubts." The next day, Juror No. 7 was reading a book during deliberations and not discussing the case. Juror No. 8 said Juror No. 7 picked up a book but put it down fairly quickly; he believed Juror No. 7 took the book in response to a feeling that she was "being ganged up on a little bit."

There was no evidence that Juror No. 7 expressed a fixed conclusion *at the beginning of deliberations* and thereafter refused to consider other points of view. On the contrary, the evidence was undisputed that Juror No. 7 listened to the views of her fellow jurors and expressed her own views on Monday, Tuesday and Wednesday. Juror No. 7 did not commit misconduct by writing down her thoughts on Wednesday evening and reading what she had written to the other jurors on Thursday morning. Defendants have cited to no authority, and we have found none in our independent research, to the contrary. After three days of deliberation, Juror No. 7's statement that further discussion would not change her views does not constitute a refusal to deliberate and is not grounds for discharge.

Finally, the evidence that, on Friday, Juror No. 7 picked up a book during deliberations but put it down "fairly quickly" does not compel a finding of misconduct. We do not know what book Juror No. 7 picked up during deliberations. As a general matter, it is misconduct for a juror to read a book and refuse to deliberate. (See *People v.*

35

*Leonard* (2007) 40 Cal.4th 1370, 1421 [no prejudice from juror announcing his decision in favor of the death penalty and then reading a book while the other 11 deliberated for one day before reaching the same conclusion].)  Nevertheless, we expect healthy and even heated debate from jurors.  (*People v. Keenan* (1988) 46 Cal.3d 478, 541.)  And a juror who feels overwhelmed does not have the option of leaving the jury room if the other jurors will not agree to a break.  (See *People v. Dorsey* (1995) 34 Cal.App.4th 694, 704 [misconduct for juror to leave deliberations for a cigarette break while other jurors continue to deliberate].)  Although cases have held it is misconduct for a juror to read aloud from the Bible or circulate Biblical passages during deliberations (see *People v. Williams* (2006) 40 Cal.4th 287, 330-331; *People v. Danks* (2004) 32 Cal.4th 269, 304-305), nothing suggests Juror No. 7 was reading a religious text.  We see a clear distinction between a juror's refusal to deliberate and a juror taking a few minutes to read something silently – the Bible, poetry, Winston Churchill's autobiography – to reduce stress, so long as the reading material is unrelated to the case and the conduct is brief in duration.  Based on the record before us, it is reasonable to infer that Juror No. 7 responded to the stress of being "ganged up on" by other jurors by taking a few minutes to read something unrelated to the case, but rejoined deliberations quickly.  On this record, we find no error in the trial court's conclusion that Juror No. 7 did not commit misconduct.

b.  Juror Nos. 4 and 12

It is undisputed that Juror Nos. 4 and 12 engaged in misconduct when they looked up "hung jury" on the internet.  The trial court was able to reconstruct exactly what information Juror Nos. 4 and 12 obtained and disseminated.  That information was relatively benign in that it was unrelated to any defendant, witness, victim or place in the case.  Far more egregious would have been interest research on the operation of cell phone towers, or accessing Google Earth to locate the locations at issue in this case.  As it was, the trial court's detailed questioning of each juror and admonition to the panel was sufficient to negate any prejudice arising from the misconduct of jurors looking up the definition of "hung jury" on the internet.  The trial court reasonably concluded the

misconduct was not incurable and reasonably exercised its discretion to admonish the jury to disregard the "hung jury" information. On this record, we find no error in the trial court's denial of the motions to discharge Juror Nos. 4 and 12, and no error in the denial of the mistrial motions based on the misconduct by those two jurors.

3.      Disclosure of Juror Indentifying Information

After judgment, Ramirez moved for the disclosure of jurors' personal identifying information for the purpose of filing a new trial motion based on juror misconduct. The motion was supported by trial counsel's declaration recounting the misconduct described above. The trial court denied the motion. We find no error.

A defendant may petition the court for access to the jurors' personal identifying information in order to communicate with jurors for the purpose of developing a motion for new trial. (Code Civ. Proc., § 206, subd. (g).) The request must be supported by a declaration that includes facts establishing good cause for the release of the information. (Code Civ. Proc., § 237, subd. (b).) We review for abuse of discretion the trial court's ruling on a motion for disclosure of juror information. (*People v. Johnson* (2013) 222 Cal.App.4th 486, 492.)

Here, when the specter of juror misconduct arose during deliberations, the trial court meticulously interviewed each juror about the allegations, outside the presence of the other jurors. As we have already explained, this process, along with the trial court's admonition, was sufficient to rebut the presumption of misconduct arising from two jurors looking up "hung jury" on the internet. Counsel's declaration in support of the motion provided no information that was not already known to and dealt with by the trial court immediately upon discovering the misconduct. On this record, we find no abuse of discretion in the trial court's denial of the motion for release of juror information.

4.      The Motions for New Trial

Prejudicial jury misconduct is also grounds for a new trial. (§ 1181.) In deciding a motion for new trial based on juror misconduct, the trial court must engage in a three step process. First, it must determine whether the affidavits supporting the motion are admissible under Evidence Code section 1150. Second, if the evidence is admissible, the

37

court must consider whether the facts establish misconduct. Third, assuming misconduct, the court must determine whether the misconduct was prejudicial. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467.)[13] Evidence of statements made and events occurring in the jury room are admissible to challenge a verdict on the grounds of juror misconduct. (Evid. Code, § 1150, subd. (a).) But, in *People v. Cox* (1991) 53 Cal.3d 618, 697 (disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22), our Supreme Court held the unsworn statement of a juror and an affidavit by an investigator recounting the juror's statement to him was not competent evidence of juror misconduct. (See *Bryant,* at p. 1469 [juror's unsworn statement insufficient].)

After several continuances, sentencing was set for April 29, 2014. On April 29, the court conducted an in camera hearing in chambers, at which counsel for all three defendants were present but the prosecutor was not. Defendants explained that Ramirez's attorney (Berkowitz) and her defense investigator met with Juror No. 7 to discuss juror misconduct relevant to a proposed new trial motion, but Juror No. 7 subsequently refused to sign a declaration.[14] Bonilla's attorney (Stein) subpoenaed Juror No. 7 to appear that day, but Juror No. 7 had informed Stein she would be out of town and was therefore unavailable. Defendants asked the trial court to issue a body attachment for Juror No. 7 for a later date, but to not disclose that fact to the People because Juror No. 7 might be even more disinclined to participate in defendants' juror misconduct investigation if the prosecutor sent another investigator to meet with her. The trial court agreed to issue a body attachment, but not secretly. In open court, the hearing

---

**13**    California courts differ on the standard of review. For example, the *Bryant* court held, " 'A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion. [Citation.]' [Citation.]" (*Bryant, supra*, at p. 1467.) But in *People v. Callahan* (2004) 124 Cal.App.4th 198, 209, the court held the question of prejudice is subject to de novo review. We need not decide which is the correct standard because, under either, we find no error in the trial court's determination that the motion was not supported by any admissible evidence.

**14**    Juror No. 7 was the foreperson who read her written statement to her fellow jurors and who was alleged to have stopped deliberating.

on defense new trial motions was set for May 15, 2014; defendants were ordered to file any written new trial motion no later than May 1; and over the People's objection, the trial court issued a body attachment for Juror No. 7, to be held to the May 15 hearing date.

Ramirez and Ortiz filed timely written motions, in which Bonilla joined. The juror misconduct allegations were based on information obtained when attorney Berkowitz and her investigator interviewed Juror No. 7. But the motions were not supported by a declaration from Juror No. 7; nor by declarations from Berkowitz or her investigator attesting to what Juror No. 7 said during the interview.

At the May 15 hearing, the trial court noted the motions were deficient in two regards: (1) the motions were not supported by admissible evidence and (2) they did not set forth any new evidence. Attorney Berkowitz (Ramirez's counsel) explained Juror No. 7 had refused to sign a declaration and counsel did not submit her own declaration or her investigator's report because since the interview, Juror No. 7 had indicated an "unwillingness or disinterest" in coming to court. Juror No. 7 was subpoenaed to the hearing, but defense counsel was not sure what she would say. Regarding new evidence, Berkowitz represented that when she and her investigator met with Juror No. 7, Juror No. 7 described the following alleged misconduct which was not disclosed in the mid-deliberation interviews with the jurors:

- Juror No. 9 brought in masking tape, toy cars and toy soldiers which the jurors used to dramatize the events described by the witnesses.
- Juror No. 9 "told the rest of the jury that, because the government doesn't have any money, that, if they're a hung jury, that the defendants will be let go because there's not enough money to retry them, and they would be let free."
- Some jurors discussed that other obligations would prevent them from continuing deliberations, which would result in a mistrial, no retrial and "no one would be punished for this horrible crime."
- A juror, who claimed to have experience with guns contradicted the gun expert's testimony.
- A juror, who claimed to be familiar with the locations at issue said stores at the swap meet would have been closed at 6:00 p.m.

39

The trial court denied the new trial motions, reasoning that the motions were not supported by the requisite affidavits and the unsworn statement of a reluctant witness was not a substitute for those affidavits. "This is the definition of a fishing expedition." We find no error.

We begin with the observation that the post-trial, unsworn statement attributed to Juror No. 7 that purported to accuse Juror No. 9 of misconduct conflicts with two statements Juror No. 9 made under oath during the mid-deliberation jury misconduct investigation. First, when asked specifically about the jury discussing penalty, Juror No. 9 said "there was some consideration about penalty. And I personally spoke up and said 'we're not to consider penalty. That is not our job. Our job is to decide on the evidence.' " Second, Juror No. 9 said she understood she had "no position to state anything about the law because I have no certification to advise anyone about the law, and I am very careful that I do not do that, have not done that." If the mid-trial investigation had disclosed that Juror No. 9 (or any other juror) made the statement alleged in the new trial motion — that the People do not retry after hung juries – the trial court could have taken appropriate measures. As it was the trial court admonished the jury generally that they were not to consider the consequences of a hung jury. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [approving the following response to jury's inquiry about consequences of deadlock: " 'you are not to speculate on that eventuality. That is a matter which must not in any way affect your decision.' "].)

More fundamentally, there was no admissible evidence that Juror No. 9 actually said a hung jury would mean defendants would be "let go" or "let free." The trial court correctly concluded trial counsel's representations of what Juror No. 7 said, but would not attest to in a declaration, and which neither counsel nor her investigator were willing to attest to in a sworn affidavit, did not constitute competent evidence of juror misconduct. As such, the new trial motions lacked evidentiary support and were properly denied.

40

E.      *Sentencing*

Ortiz makes two sentence-related contentions that, to some extent, also apply to Bonilla and Ramirez. The People concede the trial court erred in imposing an uncharged principal armed firearm enhancement (§ 12022) on counts 1 (murder of Morales) and 2 (premeditated murder of Flores), and an uncharged elderly victim enhancement (§ 667.9) on count 2. We agree and order the judgments modified accordingly.

1.      The Enhancements

We address each statutory enhancement separately.

**a.  The Section 667.9 Enhancement**

All three defendants were charged with a one-year elderly victim enhancement (§ 667.9) on the Flores robbery (count 4). The jury found defendants guilty of the Flores robbery and found true the section 667.9 enhancement. The trial court imposed but stayed sentence on count 4 pursuant to section 654, including the section 667.9 enhancement.

In addition to imposing and staying the enhancement on count 4, the trial court imposed a section 667.9 enhancement on count 2, as to which no such enhancement was charged or found true. (See § 1170.1, subd. (e) ["All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact."]; *People v. Mosley* (2015) 60 Cal.4th 1044, 1056 [other than the fact of a prior conviction, any fact that increases a sentence beyond the statutory limit must be pled and proved], citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 .) Notwithstanding the trial court's oral pronouncement of judgment on June 23, 2014, the abstracts of judgment filed on August 12, 2014, for Ortiz and Bonilla do not reflect a section 667.9 enhancement on any count, including count 4. The Ramirez abstract of judgment filed on the same day reflects a section 667.9 enhancement only on count 4, but no indication that the enhancement was stayed. It also misidentifies court 4 as "attempted murder," although the correct Penal Code section for robbery (§ 211) is used.

From the difference between the June 23 oral pronouncement of judgment and the abstracts of judgment filed on August 12, we infer the trial court realized its mistake

41

during the intervening time. But the fact that the sentencing errors are not reflected in the abstracts does not negate the error. This is because in any discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the oral pronouncement controls. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) The trial court can correct its own clerical errors with a nunc pro tunc order. (*People v. Borja* (2002) 95 Cal.App.4th 481, 485.) But in the absence of a nunc pro tunc order correcting the error, any error in the oral pronouncement of judgment, even if it is not reflected in the abstract of judgment, is still an extant error because the oral pronouncement controls.

Accordingly, we modify the judgment to strike the section 667.9 enhancement announced by the trial court on count 2 as to each defendant and direct the clerk of the superior court to modify the abstracts of judgment (1) for each defendants such that it reflects a section 667.9 enhancement was imposed on count 4, but stayed; and (2) for Ramirez so that it describes count 4 as "robbery."

### b. The section 12022 enhancement

Ramirez was charged with personal firearm use enhancements (§ 12022.53, subds. (b) (c) & (d)) as to counts 1, 2 and 4. The jury found true these enhancements and the trial court sentenced Ramirez accordingly. A one-year principal *armed* enhancement (§ 12022) was not alleged as to any defendant on any count. The trial court announced imposition of a one-year section 12022, subdivision (d) enhancement on counts 1 and 2 as to Ortiz and Bonilla. None of the abstracts reflect this enhancement. As no section 12022, subdivision (d) enhancement was alleged or found true (see § 1170.1, subd. (e)), we modify each defendant's judgment to strike the section 12022 enhancement. As noted, the abstract does not have to be modified in this respect.

### 2. The Restitution Fine

Ortiz also contends, and the People concede, that the abstract of judgment does not correctly reflect the $240 restitution fine imposed by the trial court. We agree and order the superior court to modify the abstract of judgment accordingly.

F.    *Section 1203.01 District Attorney Statement of Views*

Section 1203.01 establishes a procedure for the district attorney to convey information to the Department of Corrections that may be relevant to future punishment decisions, including parole. (*In re Minnis* (1972) 7 Cal.3d 639.) Section 1203.01, subdivision (a) reads: "Immediately after judgment has been pronounced, the judge and the district attorney, respectively, may cause to be filed with the clerk of the court a brief statement of their views respecting the person convicted or sentenced and the crime committed, together with any reports the probation officer may have filed relative to the prisoner. . . . Immediately after the filing of those statements and reports, the clerk of the court shall mail a copy thereof, certified by that clerk, with postage prepaid, addressed to the Department of Corrections and Rehabilitation at the prison or other institution to which the person convicted is delivered. The clerk shall also mail a copy of any statement . . . to the attorney for the defendant, if any, and to the defendant, in care of the Department of Corrections and Rehabilitation . . . ."

In this case, the People filed a section 1203.01 statement on July 31, 2014, about one month after judgment was entered on June 23, 2014. Ramirez contends he was denied due process because the Statement of Views does not comply with the statute in two respects: (1) there was no proof of service showing it was served on defense counsel and (2) it was not filed "immediately" after the pronouncement of judgment. Ramirez does not argue that the Statement of Views was not in fact served on defense counsel, only that there was no proof of service. We find no error.

Ramirez's contention fails for two reasons. First, section 1203.01, subdivision (a) requires that a copy of the statement be mailed to defendant and to defense counsel, but does not require a proof of service be attached. If the Legislature had intended to require a proof of service, it could have done so. (Compare § 1203.01, subd. (a) with Cal. Rules of Court, rule 8.104(a)(1)(B) [running of time to file notice of appeal triggered by service of notice of entry of judgment or copy of judgment "accompanied by proof of service[.]"].) Second, we find less than one month substantially complies with the "immediate" element.

G.    *Cumulative Error*

Because we find no error (other than the minor sentencing errors described above), Bonilla's contention (joined in by Ramirez and Ortiz) that he was denied due process and a fair trial as a result of cumulative error necessarily fails.

## DISPOSITION

As to each defendant, the section 667.9 enhancement imposed on count 2 is stricken.  As to Bonilla and Ortiz, the section 12022 enhancement imposed on counts 1 and 2 are stricken.  In all other respects, the judgments are affirmed.

The trial court shall direct the clerk of the superior court to prepare an amended abstract of judgment for defendants Bonilla and Ortiz reflecting that the section 667.9 enhancement was imposed on count 4, but stayed.

The trial court shall direct the clerk of the superior court to prepare an amended abstract of judgment for defendant Ramirez which correctly describes count 4 as "robbery."

The trial court shall direct the clerk of the superior court to prepare an amended abstract of judgment for each defendant reflecting the $240 restitution fine imposed by the trial court.

The trial court shall direct the clerk of the superior court to transmit the amended abstract of judgment for each defendant to the Department of Corrections and Rehabilitation.

                                             RUBIN, ACTING P. J.

WE CONCUR:


         FLIER, J.


         GRIMES, J.

44